Filed 6/30/2022  In re A.L. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.L. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B313919<br><br>(Los Angeles County Super. Ct. No. 20CCJP03434) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KARLA E.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Peter A. Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Mother Karla E. appeals from the juvenile court's March 12, 2021, dispositional orders removing her three children, A.L., David S. Jr. (David), and D.S. from her custody, due, in part, to Mother's substance abuse. Mother argues there was insufficient evidence to demonstrate a substantial risk of injury to the children, especially in light of the fact that between February 2021 and the dispositional hearing the following month, she was able to care for a newborn son, Da.,[1] without incident. Neither A.L.'s father, Clifton L., or David and D.S.'s father, David S. Sr. (David Sr.), is a party to this appeal.

We conclude the juvenile court did not err in removing the children from Mother's custody. The record demonstrates Mother's longstanding and continuing use of methamphetamines. In 2014, she tested positive for methamphetamines at A.L.'s birth. She tested positive for methamphetamines again in 2017 at David's birth. Then, during the pendency of these dependency proceedings and her pregnancy with Da., Mother tested positive for methamphetamines. Thereafter, she never took another drug test, missing over 20 appointments. Mother also did not enroll in any substance abuse or parenting programs that were made available to her, and she did not permit the Los Angeles County Department of Children and Family Services (DCFS) to assess

---

[1] Neither the appellate record or the briefs state Da.'s last name.

her newborn son or residence.  Thus, sufficient evidence supports the juvenile court's findings of a substantial risk of injury to the children if they remained in Mother's custody and that there were no alternatives to removal.  Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Family

Mother has five children: daughter F.M.[2] (born 2007), daughter A.L. (born 2014), son David (born 2017), son D.S. (born 2019), and son Da. (born 2021).  Only A.L., David, and D.S. are subjects of this appeal.

### B.    Child Welfare History

Between 2009 and August 2019, there were at least eight child welfare referrals in Washington State relating to F.M., A.L., David, or D.S.  The referrals were generated due to alleged domestic violence, Mother testing positive for methamphetamines at A.L.'s birth in 2014, Mother testing positive for methamphetamines at David's birth in 2017, Mother being arrested and no suitable adult being available to care for the children, alleged unsuitable living conditions, and Mother temporarily relinquishing care of A.L. to relatives.  In each instance, the referral was closed with a notation of either "[n]o disposition" or "[u]nfounded," and nothing in the record indicates that a dependency matter was ever filed in a Washington court.

However, Mother acknowledged that as a result of her methamphetamine use in 2017, Washington Child Protective Services (Washington CPS) detained her children and required

---

[2] F.M. lives with her maternal grandmother in Washington.

her to complete a substance abuse program. Thereafter, Washington CPS returned her children to her.

## C.    Events Giving Rise to DCFS's Involvement

On June 17, 2020, DCFS received a referral after five-year-old A.L. told a mandated reporter that within the previous two weeks, she observed Mother's male companion, Pedro L., put something in three-year-old David's milk bottle that caused David to become sick. A.L. also reported that she received a bruise on her nose when she sat in the front seat of Mother's car while not secured in a child safety seat.

A DCFS social worker interviewed Mother at Pedro's mother and sister's home,[3] where Mother and the children temporarily resided. Mother reported she was from Washington and had come to California the previous week so that Pedro could participate in a drug treatment program.

Mother said she and Pedro had been in a relationship since mid-2019, when D.S. was three months old. When she met Pedro, she believed he was an alcoholic, but he went to treatment, and they moved in together.[4] She later learned of Pedro's methamphetamine addiction. She denied that Pedro physically or verbally abused her or the children. Mother acknowledged Pedro dealt with depression.

According to Mother, Pedro's family called law enforcement after David threw a tantrum. David slapped Mother, and when

_____

[3] Christina L., Peggy L., Peggy's son, Hector L., and Miguel L. live in the house. Pedro's sister, Belen L., and her daughter, Gabby V., frequent the home to assist in caring or Christina L.

[4] On March 7, 2016, Pedro was arrested for driving under the influence.

Pedro intervened and David continued to cry, family members in the home thought Pedro had "done something" to David. When the police arrived, A.L. told them that Pedro put methamphetamines in David's bottle. Mother denied the allegation, observing that David does not use a bottle. A.L. then specified that Pedro smokes from a cup and her brother drank from the same cup. Mother said Pedro had been sober since traveling to California from Washington two weeks earlier and that she would not stay with him if she thought he was using drugs.

Mother disclosed that she recently took a pregnancy test and learned she was pregnant by Pedro. When she told Pedro that she was pregnant, he told her to leave him, and they argued. They did not physically fight.

Mother reported that all the children were in car seats during the drive from Washington to California. She also said that the car seats were thrown away along the way because they were in bad condition. After they arrived in California, Pedro's family provided new car seats for the boys, and Mother was working on obtaining one for A.L. Mother denied the allegation that A.L. bruised her nose riding in the front seat with no car seat. Rather, A.L. had climbed into the car while Pedro was repairing it. He told her to get out because he was going to lower the car. Believing she was no longer in the car, he lowered the car off the jack stand, and the jolt caused A.L. to hit her nose on the dashboard.

The social worker assessed the children and determined that they had no marks or bruises. Due to the COVID-19 virus, the social worker did not evaluate the inside of the home.

5

Pedro's niece, Gabby V., expressed concern about Pedro currently using drugs and Mother's ability to care for the children. Gabby had remained at the house two days longer than she had planned because A.L. became so attached to her. A.L. told Gabby that Mother slapped her in the face and that Pedro was mean to her and did "bad things." A.L. did not define what she meant by bad things. Gabby said A.L. seemed scared because whenever the child talked about Pedro or Mother, she looked around to see if they were present.

The social worker interviewed A.L. with Gabby present, at A.L.'s request. A.L. reported seeing Pedro smoking out of a cup and that the contents smelled like smoke. Her brothers drank from the same cup. A.L. said Pedro was mean to her. When Pedro was angry with her, he gave her chilies to eat, which made her cry. A.L. was scared of Pedro and looked back towards the door to see if anyone was coming. She reported that Mother slapped her face when she got into trouble and that Mother and Pedro fought with their hands and their words.

Mother agreed to a safety plan that included leaving the home with the children if Pedro appeared to be under the influence. Mother also agreed to submit to drug testing the following day, June 18, 2020. Mother failed to appear for the test.

The next day, the social worker was unable to reach Mother by phone. Pedro answered when the social worker called his number, but he became defensive and ended the call.

The social worker spoke with maternal grandmother by phone. She reported that Mother and D.S. tested positive for

methamphetamines when D.S. was born.[5] Washington CPS removed the children from Mother's custody for a time and required her to attend drug treatment.

On June 22, 2020, Pedro's sister, Belen L., told the social worker that A.L. had not been with Mother since last week and had been staying with Belen's sister. Belen noted that she had been with law enforcement for 20 years and believed, based on Mother's statements, actions, and skin, that Mother was an addict. She also believed Pedro was an addict and described some of his erratic behaviors. Belen reported Mother was no longer welcome in the home of Belen's mother because her mother was suffering from stress. Belen also told the social worker that Gabby overheard Pedro warning A.L.: "You wanna tell, watch and see what's gonna happen to you."

That day, a social worker also spoke with Mother. Mother was upset that the social worker had spoken with maternal grandmother and told the social worker that DCFS could not prove anything about her or Pedro and that she would continue to protect Pedro. Mother agreed to submit to a drug test that day but again failed to do so.

## D.    DCFS Detains the Children

On June 23, 2020, the juvenile court granted an expedited removal order permitting DCFS to detain A.L., David, and D.S. A DCFS social worker, accompanied by law enforcement, went to the family's residence to detain the children. Pedro locked himself in the bathroom, and Mother continued to state that

---

[5] Records from Washington CPS do not state that Mother or D.S. tested positive for methamphetamines at the time of D.S.'s birth.

7

DCFS had no proof Pedro was using drugs. During A.L.'s transport to foster care, the social worker stopped to get her food for dinner. When asked what A.L. had eaten for breakfast that day, A.L. responded she had not eaten anything yet.

A.L. was placed with one of Pedro's sisters, Julia V., and her family. David and D.S. were placed with Belen.

The next day, Mother was informed that her visits with the children would be monitored. Mother continued to insist that DCFS had no proof that Pedro had actually relapsed, even though Pedro admitted to his brother that he was using drugs. Mother stated that she did not do anything wrong. She explained that A.L. said things about Pedro because she has a "wild imagination."

**E.    The Petition and Amended Petition**

On June 25, 2020, DCFS filed a section 300 petition. It alleged the children came within the juvenile court's jurisdiction pursuant to section 300, subdivisions (a) and (j) based upon Mother striking A.L. in the face and danger to her siblings David and D.S. as a result thereof (counts a-1 and j-1). DCFS also alleged the children came within the juvenile court's jurisdiction pursuant to section 300, subdivision (b) as a result of Mother's failure to protect caused by Mother slapping A.L. in the face (count b-1); Pedro's substance abuse, history of mental and emotional issues, and forcing A.L. to eat hot chilies (count b-2); Mother's substance abuse (count b-3); and Mother permitting the children to be driven from Washington to California without being secured in car seats (count b-4).

On September 16, 2020, DCFS filed an amended petition, alleging pursuant to section 300, subdivision (b), that A.L., David, and D.S. suffered or there was a substantial risk they

8

would suffer serious physical harm or illness as a result of David Sr.'s domestic violence and substance abuse and Mother's failure to protect them (counts b-5, b-6). DCFS also alleged that pursuant to section 300, subdivision (b), A.L. was at risk of harm due to Clifton's substance abuse (count-b-7).

## F. Detention Hearing

On June 30, 2020, the juvenile court found there had been a prima facie showing that A.L., David, and D.S. were persons described by section 300 and ordered the children temporarily removed from their parents. The juvenile court also ordered DCFS to provide drug testing and no or low cost referrals for educational programs for Mother.

## G. Jurisdiction and Disposition Report

Between July 30, 2020, and August 11, 2020, a social worker interviewed Mother, Belen, A.L.'s half-sister, A.L., maternal grandmother, and Pedro's ex-wife about the allegations in the petition. At this time, Mother stated she was living in a motel in El Monte, California, and that Pedro returned to Washington.

### 1. *Hitting A.L. in the Face (Counts a-1, b-1, j-1)*

Mother denied hitting A.L. in the face. A.L. explained that it was not true that Mother slapped her in the face. Mother hit her on her buttock with a sandal, and one time while they lived in Washington, the strike from the sandal left a purple mark on A.L.'s buttock. Mother also sometimes struck David with a sandal. Other than that, no adults hit A.L. A.L. stated she was not afraid of Mother and missed her. Based on this information, DCFS recommended that the juvenile court dismiss counts a-1, b-1, and j-1.

2. *Pedro's Substance Abuse and Forcing A.L. to Eat "Hot Chilies" (Count b-2)*

Mother confirmed Pedro struggled with alcohol when they first began to live together. She did not believe, until recently, that Pedro struggled with drug abuse, and she believed he wanted "to get help to do better." With regard to placing chilies in A.L.'s mouth, Mother did not believe A.L. and observed that A.L. liked Pedro and always wanted to be around him. Maternal grandmother also stated that A.L. "tells lies" and that she did not believe A.L.'s statement about the hot chilies.

With regard to substance abuse, A.L. stated that Pedro smokes out of a bottle, that it "smells bad and lots of white smoke com[es] out of the top," and that Mother told Pedro to "stop smoking that," but could not get the bottle from him. Once, David put his mouth on the bottle when he found it on the floor. A.L. also confirmed Pedro made her eat hot chilies. Belen told the social worker that, based on her law enforcement experience, she believed Pedro was using drugs.

Pedro's ex-wife stated she divorced Pedro due to ongoing substance abuse issues. She obtained a stay-away order against Pedro and has custody of their son. She does not trust Pedro to be around their son and believed he should not be around anyone else's children either.

3. *Mother's Substance Abuse (Count b-3)*

Mother admitted she had a history of substance abuse, including that she and David Sr. used methamphetamines during their relationship. DCFS also obtained information from Washington CPS that Mother tested positive for methamphetamines in 2014, at A.L.'s birth and in 2017, at David's birth. After the children were detained from Mother in

10

Washington in 2017, she completed a substance abuse program. Washington CPS thereafter returned her children to her. Mother claimed she has been clean and sober since that time.

Maternal grandmother did not believe Mother was currently using drugs. A.L. never saw Mother use Pedro's bottle to smoke. However, Belen believed Mother was currently using drugs.

On July 9, 21, 28,[6] and August 13, 2020, Mother tested negative for drugs and alcohol. She did not appear for her drug tests scheduled for July 13, 2020, or August 3 or August 20, 2020. On August 26, 2020, Mother tested positive for methamphetamines. A social worker spoke with Mother about the positive result, and Mother stated it must have been a mistake.

### 4. *Child Seats (Count b-4)*

A.L. told the social worker that she sat in a booster seat during the trip from Washington to California. The booster seat was never placed in the front seat. Mother stated she would never drive without proper car seats for the children. She repeated that the family threw away the car seats for A.L. and David when they arrived in California because the seats were dirty. However, Belen stated when the family first arrived, the only child in a car seat was D.S. When Belen confronted Mother about the lack of car seats at that time, Mother remained silent.

---

[6] The appellate record does not contain lab test results from July 28, 2020. However, a last minute information (LMI) for the hearing scheduled for November 30, 2020, and an LMI for the hearing scheduled for January 6, 2021, state Mother tested negative for substances on July 28, 2020.

11

5. *David Sr.'s Domestic Violence and Substance Abuse (Counts b-5, b-6)*

In January and May 2018, law enforcement in Washington responded to calls of domestic violence by David Sr. against Mother. A.L. stated she witnessed David Sr. hit Mother. Mother confirmed that David Sr. used methamphetamines while they were together.

6. *Clifton's Substance Abuse (Count b-7)*

Mother stated that Clifton had problems with substance abuse. Clifton confirmed he had substance abuse issues and was in prison for possession of a controlled substance.

The social worker concluded that Mother repeatedly placed her children in dangerous and volatile circumstances and displayed poor impulse control. Further, Mother continued to deny unresolved substance abuse issues and continued to use methamphetamines despite being pregnant.

## H. November 30, 2020 and January 6, 2021 LMIs

Mother failed to attend meetings with a DCFS social worker in October 2020 and on November 12, 2020. On November 23, 2020, and December 4, 2020, the social worker inquired about Mother's progress in participating in parenting or substance abuse treatment programs. Each time, Mother responded she was not in any programs because her attorney advised her that the case would be transferred to Washington.

Mother reported that she and Pedro were living in a motel near the children, but Mother did not know the address. Mother stated she would submit an application for housing assistance.

Mother visited the children twice a week, monitored by the children's foster parents. There were no concerns as a result of the visits.

## I.     February 25, 2021 LMI

During the last week of January or first week of February 2021, Mother gave birth to Da.  The foster mother saw Da. and reported he appeared healthy, but she did not provide any further information about the baby or his condition.  At the time of the LMI, Mother had not enrolled in any programs.  Further, she was evasive as to her address.  According to the foster mother, Mother was "technically transient."

The LMI also included further allegations by A.L. that Pedro was violent towards Mother when they lived in Washington.  As a result, on February 18, 2021, a referral for physical abuse and domestic violence was generated.  The referral was "evaluated out," however, because the children were not at risk due to their out of home placement and "baby Da[.] was not considered to be at risk because he was not born when the alleged incidents occurred."  DCFS advised the juvenile court that "[i]n light of the new information, [DCFS] will continue to make efforts in obtaining an address for [Mother] and to assess the newborn child."

DCFS further reported that Mother missed 23 weekly random drug tests between September 4, 2020, and February 17, 2021.[7]

---

[7] The appellate record includes 22 lab reports indicating Mother did not submit to substance tests on September 4, 10, 16, 23 and 30, 2020; October 6, 16, 19, and 30, 2020; November 4, 10, 17, and 23, 2020; December 4, 11, 18, 22, and 28, 2020; January 22 and 27, 2021; and February 5 and 17, 2021.

**J. Proceedings Pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act**

On October 26, 2020, the juvenile court expected Washington would assert jurisdiction over the matter. By November 13, 2020, however, the juvenile court reported it appeared that a Washington court would not assert jurisdiction, and therefore, the juvenile court planned to retain jurisdiction and proceed. According to the January 6, 2021, LMI, by December 18, 2020, the juvenile court had spoken with a commissioner in the Washington court, and Washington declined to open a case for the children there. Accordingly, the juvenile court proceeded to exercise its jurisdiction in California.[8]

**K. Jurisdictional and Dispositional Hearing and Orders**

At the March 12, 2021, combined jurisdictional and dispositional hearing, the juvenile court dismissed the counts relating to Mother allegedly slapping A.L. (counts a-1, b-1, and j-1), Mother's alleged failure to use car seats (count b-4), and David Sr.'s alleged domestic violence and Mother's failure to protect the children therefrom (count b-5).

---

[8] Clifton appealed the juvenile court's March 12, 2021, jurisdictional dispositional orders on the basis that the juvenile court failed to make a sufficient record of its communications with the Washington court under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code, § 3400 et seq.) before asserting jurisdiction over his daughter, A.L. Mother was not a party to the appeal. In an unpublished opinion, we concluded the juvenile court complied with the UCCJEA and affirmed its March 12, 2021 orders. (*In re A.L.* (Feb. 17, 2022, B311556) [nonpub. opn.].)

The court found it had jurisdiction over the children pursuant to section 300, subdivision (b). It sustained the counts relating to Mother's failure to protect the children from Pedro's substance abuse and excessive discipline of A.L. (count b-2), Mother's substance abuse (count b-3), David Sr.'s substance abuse and Mother's related failure to protect the children (count b-6), and Clifton's substance abuse (count b-7).

The juvenile court then determined clear and convincing evidence relating to each sustained count supported removing the children from Mother and fathers David Sr. and Clifton. The court ordered reunification services for Mother.[9]

Mother appealed.[10]

## DISCUSSION

### A. Legal Principles and Standard of Review

Mother challenges the juvenile court's dispositional orders removing A.L., David, and D.S. from her custody on the basis that there was not clear and convincing evidence of a substantial risk of injury necessitating removal. Mother does not challenge the jurisdictional orders.

---

[9] During the jurisdictional and dispositional hearing, Mother's counsel represented that she would obtain Mother's physical address.

[10] Mother's counsel attempted to file a notice of appeal in the juvenile court on March 15, 2021. Mother's appeal was rejected due to a failure to sign the notice. However, the firm's support staff did not notify counsel in a timely manner of the rejection. On July 27, 2021, Mother refiled the notice of appeal, and on July 30, 2021, sought relief from default pursuant to *In re A.R.* (2021) 11 Cal.5th 234. On August 5, 2021, we granted Mother's motion for relief.

To remove a child from the custody of a parent with whom the child resided at the time the petition was filed, the juvenile court must find by clear and convincing evidence that one of five grounds exists pursuant to section 361, subdivision (c). (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Of relevance here, "[o]ne ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child." (*Ibid.*, citing § 361, subd. (c)(1).) " 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

" ' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' [Citation.] In reviewing for substantial evidence to support a dispositional order removing a child, we 'keep[ ] in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence.' [Citations.]" (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 122-123.)

16

The clear and convincing evidence standard " ' "requires a finding of high probability.  The evidence must be so clear as to leave no substantial doubt." ' " (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.)  " '[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*Id.* at p. 155 [applying the standard of review articulated in a conservatorship matter to a dependency proceeding], quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

**B.**    **The Record Demonstrates a High Probability of Substantial Risk of Injury to the Children If They Remained in Mother's Custody**

Relevant to the juvenile court's decision to remove a child from a parent who suffers from alcohol or drug abuse "are such factors as the type of drug involved, extent and length of the addiction, age of the child[ren], the child[ren]'s special needs, if any, the parent's acknowledgement of the problem, the parent's current status in treatment, the availability of services, the problems created by the abuse, and whether there is another protective individual in the home."  (Seiser & Kumli, 1 Cal. Juvenile Courts Practice & Procedure (2020) § 2.126.)  A parent's failure to acknowledge that a substance abuse problem exists " 'is . . . relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' [Citation.]"  (*In re A.F.* (2016) 3 Cal.App.5th 283, 293; see *In re J.C.* (2014) 233 Cal.App.4th 1, 6-7 [affirming removal notwithstanding the father's participation in treatment where his treatment provider reported his participation was " 'sluggish,' "

17

he missed two drug tests, and had a long history of substance abuse].)

Here, Mother has a confirmed longstanding history of methamphetamine abuse, and substantial evidence establishes that at the time of the combined jurisdictional and dispositional hearing, Mother continued to use methamphetamines and failed to acknowledge the risk to her children created by her drug use. Mother tested positive for methamphetamines at the time of A.L.'s birth in 2014. Mother acknowledged she used methamphetamines with David Sr. when they were together, and she tested positive again at David's birth in 2017. As a result, in 2017, her children were detained by Washington CPS, and she was required to complete a drug treatment program in order to have them returned to her. Nevertheless, in August 2020, Mother again tested positive for methamphetamines. Thereafter, Mother never took another drug test, missing over 20 drug test appointments. These missed tests may be considered equivalent to a positive result. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217.)

Mother's failure to participate in any educational or counseling programs further supports the juvenile court's finding that removal was necessary. (See *In re J.C.*, *supra*, 233 Cal.App.4th at pp. 6-7.) Mother claims she delayed enrolling in any programs because her attorney advised her the matter would be transferred to Washington. However, at the November 13, 2020, hearing, the juvenile court indicated it would very likely retain jurisdiction in California, and Mother still declined to participate in any programs before the dispositional hearing on March 12, 2021. Moreover, Mother does not explain why a potential transfer to Washington should have prevented her from

18

enrolling in programs to address significant issues in her life during the eight to nine months between the time her children were detained by DCFS and the dispositional hearing.

Mother argues that she had been caring for her newborn son, Da., without incident from the time of his birth in or about February 2021 until the March 12, 2021, dispositional hearing, and this demonstrates that A.L., David, and D.S. would not have been at risk of harm in her custody. She contends "[i]f a newborn child was considered to be safe in Mother's care, it was nonsensical to conclude that her older children were not."

The record does not establish that Da. was safe in Mother's care. After Da. was born, there was a referral to DCFS based upon A.L.'s allegations of Pedro's domestic violence against Mother, but it was "evaluated out" because Da. "was not born when the alleged incidents occurred." DCFS faced difficulties in locating Mother and "assess[ing] the newborn child" at all. At no point was there a finding that Da. was safe in Mother's care or that her substance abuse did not place him at risk.

Mother further argues her monitored visits with her children twice a week for two to three hours each visit with no concerns arising therefrom demonstrate consistency, stability and sobriety. As explained above, however, substantial evidence supported the juvenile court's finding that Mother's continued substance abuse posed a substantial risk of injury to her children. The juvenile court could reasonably infer that Mother's positive methamphetamine test two months after her children were detained and after she knew she was pregnant with another child indicates she lacked the ability to control her addiction or to appreciate the risks of her behavior to her children. Mother's refusal to participate in educational and counseling programs

19

further supports this inference.  It is not a function of an appellate court to reweigh evidence.  (*In re Nathan E.*, *supra*, 61 Cal.App.5th at pp. 122-123.)

We are also not persuaded by Mother's arguments that there were alternatives to removal, including unannounced visits by DCFS, and that "she was willing to participate in any programs that would allow the children to stay with her."  The record reflects that at the time of the jurisdictional and dispositional hearing, Mother had repeatedly evaded DCFS's supervision and declined to participate or even enroll in any programs.  The juvenile court need not have found credible Mother's promises that she would act differently in the future.

## DISPOSITION

The March 12, 2021 dispositional orders removing A.L., David, and D.S. from Mother's custody are affirmed.

NOT TO BE PUBLISHED

MORI, J.\*

We concur:

ROTHSCHILD, P. J.          CHANEY, J.

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.